UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| DEBBIE A. PEIRICK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:03-cv-1965-LJM-WTL |
| | ) | |
| INDIANA UNIVERSITY-PURDUE | ) | |
| UNIVERSITY INDIANAPOLIS ATHLETICS | ) | |
| DEPARTMENT; INDIANA UNIVERSITY- | ) | |
| PURDUE UNIVERSITY INDIANAPOLIS; and | ) | |
| THE BOARD OF TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, | ) | |
| Defendants. | ) | |


**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment brought by defendants,

Indiana University-Purdue University Indianapolis Athletics Department, Indiana University-Purdue

University Indianapolis, and The Board of Trustees of Indiana University (collectively, "IUPUI"),

on the claims of plaintiff, Ms. Debbie A. Peirick ("Peirick").  Peirick's claims are based on Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq*, as amended by the Civil

Rights Act of 1991, Pub. L. No. 102-166 *et seq.*, and the Age Discrimination in Employment Act

of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, as amended by the Age Discrimination in Employment

Act Amendments of 1996, Pub. L. No. 104-208 *et seq.*  The parties have fully briefed their

arguments, and the motion is now ripe for ruling.

1

# I. __FACTUAL BACKGROUND__

## A. PEIRICK'S EMPLOYMENT AT IUPUI

On September 16, 1990, Peirick became the head coach of IUPUI's women's tennis team. Pl. Br. at 2. Peirick's duties included demonstrating a commitment to academics, community service, compliance with IUPUI rules and policies and those of the National Collegiate Athletics Association ("NCAA"), budget management, fundraising, professional conduct and development, and athletics competition. Pl. Ex. B. Peirick had recognized success in her commitment to academics, Pl. Exs. K-Q, community service, Pl. Exs. C-J, and athletics, leading the women's tennis team to its best ever season in 2003, her final year. Pl. Exs. R-S. Also, several former players, their parents, and Peirick's colleagues have filed affidavits or testified in support of Peirick's professionalism, management, and coaching skills. *See* Bednar Aff. ¶¶ 5-10; H. Byard Aff. ¶¶ 7-10, 17; Cunningham Dep. at 43-45; R. Byard Aff. ¶¶ 7-12; Cunningham[1] Aff. ¶¶ 7-13, 15; Clark Dep. at 46; Franklin Dep. at 64-65; Rich Lord Dep. at 98-99; Simpson Dep. at 33.

Until her termination in 2003, Peirick's employment was renewed on a yearly basis. *See* Pl. Br. at 13. According to the cover letter informing her of her most recent renewal, she was appointed to her position and compensation was paid in equal monthly installments. Pl. Ex. CC. Peirick also received retirement benefits. Pl. Br. at 13. Peirick was not required to log hours worked. *Id.* This type of appointment and payment of head coaches was not unique to Peirick. *Cf.* Pl. Ex. CCC (same form letter for Mr. John Andrews, the head coach of men's and women's golf). Requirements and evaluations of all head coaches appears to have been uniform throughout the Athletic Department.

---

[1] The Cunningham Affidavit refers to the sworn statements of Ms. Pamela Cunningham, parent of Peirick's former player Ms. Michelle Cunningham. *See* Cunningham Aff. ¶ 3. The Cunningham Deposition refers to the statements of Ms. Michelle Cunningham.

*See* Pl. Exs. B, DD.

However, Peirick and some of her colleagues did not perceive equal treatment of coaches at IUPUI.  For example, Mr. Michael Moore ("Moore"), the Director of Athletics at IUPUI, received a comment on his five-year administrative review noting the existence of "a perceived differential treatment of male and female coaches . . . both males [sic] and female staff raised this issue.  Some staff feel that Mr. Moore appears to be uncomfortable dealing with women or may not value women [sic] sports as much as men's sports."  Pl. Ex. EE at 3.[2]  Peirick goes on to cite six specific reasons why she believed there was differential treatment of male and female coaches.  Pl. Br. at 14-15. First, the women's tennis team only had two athletic scholarships (of a possible eight under NCAA rules), whereas the men's team had four (of a possible four).  Peirick Dep. at 262-63.  Second, Moore did not interact with the female coaches the way he did the male coaches (such as chitchatting about professional sports).  *Id.* at 89-90.  Third, Moore ignored female coaches at social events, and would

_____

[2]This evidence is objected to by IUPUI as at least double hearsay and therefore outside this Court's considerations for purposes of summary judgment.  Def. Reply at 16 n.7.  *See Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1264-65 (7th Cir. 1993).  Peirick asserts that the evidence is admissible under the business records exception to hearsay, Federal Rule of Evidence 803(6), as IUPUI's own records.  Pl. Reply at 11-12.  This Court agrees with Peirick.  First, the factual information was collected and recorded by Ms. Lillian Charleston, an Affirmative Action Officer for IUPUI, and based on statements from informants with knowledge—all professional staff in the Athletic Department—and under a business duty to transmit that information to Ms. Charleston.  *See* Charleston Dep. at 92-99; *Datamatic Servs., Inc. v. United States*, 909 F.2d 1029, 1032 (7th Cir. 1990).  Second, it was a regular practice of IUPUI to have such periodic administrative reviews.  *See* Charleston Dep. at 95.  Third, the acts were recorded at or near their time of occurrence, as the review was during Moore's tenure.  Fourth, Ms. Charleston's testimony confirms the likely validity of the document, which was surrendered by IUPUI during discovery.  Pl. Reply at 11.  *See* Charleston Dep. at 92-99.  IUPUI points to nothing in the information itself or in the information's method or circumstances of preparation to indicate a reason to doubt its trustworthiness.  *See generally Wheeler v. Sims*, 951 F.2d 796, 802 (7th Cir. 1992) (outlining these four steps for a Rule 803(6) analysis).  Therefore IUPUI's objection is **OVERRULED**.  IUPUI's additional objection that this report is vague also is **OVERRULED**.

3

introduce only the male coaches to "important" persons. *Id.* at 91-92, 94-96. Fourth, the male coaches had larger offices than the female coaches. *Id.* at 92-93. Fifth, Moore was more lenient with male coaches than female coaches about turning in mandatory paperwork. *Id.* at 93. Sixth, at a golf tournament fundraiser, Moore recognized the head coach of the men's basketball team for advancing to the NCAA basketball tournament, but did not recognize the women's tennis team for similarly advancing to it's NCAA tournament for the first time in school history. *Id.* at 96.

Peirick's colleagues also felt a lack of equality. Ms. Kris Simpson ("Simpson"), the former women's basketball coach, stated that Moore's treatment of women was especially poor. Simpson Dep. at 43-46. For example, on one occasion where Moore had attended a women's basketball game he began putting empty chairs away before the game was over. *Id.* Simpson also notes Moore's more intimate interactions with the male head coaches, Moore's failure to introduce female head coaches to important people at social events, and that the women's basketball team had to share a locker room with three other teams, unlike the men's basketball and soccer teams. *Id.* at 46-48, 53. Ms. Linda Carroll ("Carroll"), the former assistant director of athletics and Senior Women's Administrator ("SWA"), resigned from her position because of her perception of Moore's treatment of women. Carroll Aff. ¶ 15. Carroll noted that Moore had a better rapport with the male coaches, and often acted "as if there was a screen" between himself and female coaches. *Id.* ¶ 6. Moore also refused to sit with Carroll at conference meetings, even though the protocol at these meetings was for an Athletic Director to sit with his or her same school's SWA. *Id.* ¶ 7.

In addition, Peirick believes there was a lack of gender equality because male head coaches received more benefits for comparable work and were punished more leniently than female head coaches. *See* Pl. Br. at 16-20. For example, Mr. Rich Lord ("Lord") was the part-time men's tennis

head coach, a job he believes was comparable to Peirick's. *See* Rich Lord Dep. at 38. Lord was also the full-time tennis instructor at the Indianapolis Tennis Center. Def. Br. at 21 n.4. Lord received health insurance benefits, which were mostly paid through his full-time position but partially paid by the Athletics Department for his coaching duties. *See* Rich Lord Dep. at 40-41. In addition, between 2000 and 2004, Lord committed four separate and documented violations of IUPUI and/or NCAA rules. *See id.* at 76; Pl. Exs. FF-JJ. Although Simpson has acknowledged that minor NCAA rules infractions are not uncommon due to the complexity of the rules, Lord received three letters of reprimand for the minor violations as well as a one-week suspension for the most serious violation. *Id.*; Simpson Dep. at 30-32. Peirick has no documented rules violations, although her annual review in 1999 did indicate a need to improve her relationships with student-athletes. Pl. Br. at 17; Peirick Dep. Ex. 11.

Lord also had several policy violations for which he was subjected to IUPUI's "progressive discipline" policy (explained in subsection I.B., below). These violations included use of profanity, poor planning, poor year-end evaluations, and allowing players to attend strip clubs while at away matches. *See* Rich Lord Dep. at 51-54, 69-71. For these violations, Lord received verbal reprimands and verbal counseling, but Lord was allowed to keep his job and work on his problems. *See id.*; Pl. Ex. KK.

Mr. Steve Franklin ("Franklin")—the men's soccer head coach since 1995—has also violated NCAA and IUPUI rules without losing his employment. *See* Pl. Br. at 18-20. The NCAA violations included the use of ineligible student-athletes, providing transportation to ineligible student-athletes, providing an impermissible extra benefit to a student-athlete, impermissible recruiting phone calls, and inappropriate attire. *See* Pl. Exs. LL-NN. These violations occurred between 1996 and 2000,

although Franklin's only punishment was a suspension in 1996.  *Id.*  In 2002 and 2003, Franklin's players and their parents began complaining about verbal and emotional abuse, and Franklin's inappropriate behavior extended to sarcasm, bullying his players, and playing mental games with his players.  *See* Pl. Exs. TT-WW; OO-QQ.  For this, Franklin received a reprimand from Moore requiring Franklin to develop a Plan of Action under the threat of termination.  *See* Pl. Ex. RR, SS. Moore gave Franklin the opportunity to defend himself against the accusations and verbal and emotional abuse.  Franklin Dep. at 55-56.  These punishments are consistent with IUPUI's progressive discipline policy.  *See* Pl. Ex. T.

As final examples of the disparity in treatment between the male and female head coaches, Peirick notes that Mr. John Andrews ("Andrews") (the head coach of the men's and women's golf teams), Mr. Ron Hunter (the head coach of the men's basketball team), and Mr. Scott Williams (the head coach of the men's and women's cross country teams) all received progressive discipline when NCAA or IUPUI violations were discovered.  *See* Pl. Br. at 20; Pl. Exs. XX-HHH.  These disciplines most commonly involved written reprimands, and none of these coaches has been fired.  *See id.* Andrews, in addition, has received several negative comments in his evaluation forms and has also received a verbal reprimand regarding his organization and paperwork.  Pl. Ex. FFF.

Peirick also perceived a lack of equality in treatment of coaches of different ages.  At the time of her firing, Peirick was fifty-three years old and the oldest head coach at IUPUI.  *See* Pl. Ex. A. Peirick was replaced by Ms. Andrea Lord ("Ms. Lord"), the (then) twenty-three year old sister of men's tennis coach Rich Lord.  Pl. Br. at 21.  Ms. Lord is the youngest head coach at IUPUI and, it is presumed, the youngest head coach at any NCAA level in the nation.  *See id.*; Andrea Lord Dep. at 36-38.  Ms. Lord was significantly younger and significantly less experienced than Peirick,

6

including having never before coached any team.  Moore Dep. at 130; Andrea Lord Dep. at 49.  Yet it seems that she was the only applicant for the position that satisfied IUPUI's necessary criteria, described as "[e]xperience as a head or assistant coach with evidence of success in coaching and recruiting."  LaVonne Jones Aff. ¶ 5; Pl. Ex. III.  IUPUI also recognized that Ms. Lord was a nationally ranked tennis player while she was in college, unlike Peirick.  Def. Br. at 15.  However, when Peirick was in college, she was not allowed to play tennis under the relevant collegiate rules of the time because she was female.  Pl. Br. at 22 n.10.  Despite Ms. Lord's lack of coaching and recruiting experience, Ms. Lord's starting salary was nearly $3,000 more than Peirick's salary during Peirick's final year.  *Compare* Pl. Ex. CC *with* Pl. Ex. KKK.

In addition, Peirick believes that the younger head coaches were given more lenient punishments by Moore.  For example, at the time of Peirick's firing, Franklin was forty-four years old, Mr. Hunter was thirty-nine, and Mr. Lord was thirty-six.  Pl. Br. at 23.  All of these coaches were subjected to IUPUI's progressive discipline policy.

### B.  PEIRICK'S TERMINATION FROM IUPUI

On June 10, 2003, Peirick was informed that she would not be returning to coach the women's tennis team after nearly 13 years.  *See id.* at 10.  Moore informed Peirick only that her appointment was not being renewed because Moore wanted to take the team in a different direction.  *See* Pl. Ex. Z.  Moore gave Peirick the opportunity to retire, which she declined.  *See id.*; Moore Dep. at 80-81.

IUPUI's progressive discipline policy applies to all appointed, nonunion biweekly, and monthly staff members.  That policy states:

It is the university's policy and practice that discipline be progressive in nature, beginning with the least severe action necessary to correct the undesirable situation, and increasing in severity if the condition is not corrected.

In addition to being progressive in nature, it is important that the degree of discipline be directly related to the seriousness of the offense and the employee's record; therefore, it is possible for steps to be skipped or repeated.

* * *

Steps of progressive discipline may include:
1. Oral warning
2. Written warning
3. Suspension or final warning (for biweekly staff) or second written warning instead of suspension (for monthly staff)
   ○ This can be a repetitive step where the amount of time increases with each suspension.  For monthly staff, under the Fair Labor Standards Act, suspension without pay or reduction in pay for less than a workweek is allowed only for infractions of critical safety rules.
4. Termination

* * *

It is essential to document all employment actions, especially those designed to change the status of an employee.  Departments are to create and maintain disciplinary action records and share these records with the employee and Human Resources Administration.

In cases where discipline could result in a loss of employee pay or benefits (suspension or termination), departments must give the employee an opportunity to receive and present information and ask questions (described below) *before* making a decision to discipline.

Opportunity to receive and present information and ask questions[:] The elements of the opportunity are:
•   An opportunity for the employee to be provided information by the supervisor relating to the nature and manner of the infraction or deficiency.
•   An opportunity to ask questions, to explain, to respond, and to give information about the allegations to the individual in the department who will make the decision to change the employee's status.  The employee may have a representative other than an attorney or a union affiliate present during this opportunity.
•   An opportunity to have the employee's information considered by the

8

> decision maker prior to a final determination of discipline being issued.
> •   An opportunity to receive written notification of the final decision.

Pl. Ex. T (original emphasis).

Peirick was appointed to her position on a yearly basis, paid in monthly installments, and was a head coach when other head coaches received progressive discipline for IUPUI or NCAA violations; however, Peirick did not receive progressive discipline. *See* Pl. Ex. Z. Peirick was terminated without having been informed of her alleged negative conduct and without having the opportunity to respond to these allegations. *See id.* This seems to be because Ms. Denise O'Grady ("O'Grady"), the Assistant Athletic Director at IUPUI, was informed by Ms. LaVonne Jones ("Jones"), an IUPUI Human Resources Consultant, that Peirick was not entitled to progressive discipline. O'Grady Aff. ¶ 2; O'Grady Dep. at 56-57. However, Jones's information was based on O'Grady's statement to Jones that Peirick was an hourly employee. LaVonne Jones Dep. at 83. Moore and IUPUI admit that they relied on this information in the decision-making process. Def. Br. at 13; Pl. Ex. Z.

After Peirick was released and initiated legal action, Moore offered seven reasons for her dismissal. First, Moore accused Peirick of using inappropriate or abusive language. *See* Def. Br. at 1, 17-19. Peirick and supporting students and parents challenge this accusation. *See* Bednar Aff. ¶ 11; H. Byard Aff. ¶ 11; R. Byard Aff. ¶ 9; Cunningham Aff. ¶ 10. Use of such language was prevalent among the coaches and Moore himself. *See* Carroll Aff. ¶ 11; Clark Dep. at 38; Peirick Dep. at 274-75; Simpson Dep. at 64. Information of these accusations was never brought to Peirick's attention, nor was Peirick given the opportunity to respond to this accusation before her dismissal. *See* Pl. Ex. Z.

Second, IUPUI believes that Peirick left some players behind on a road match in Tennessee. Def. Br. at 1, 6. Peirick, however, believed that the additional students were following her, but then found they were no longer behind her. Pl. Br. at 5. Players and parents confirm Peirick's belief. Cunningham Dep. at 20; Cunningham Aff. ¶ 11. Again, this accusation as a basis of dismissal was not previously brought to Peirick's attention for her to respond properly. *See* Pl. Ex. Z.

Third, IUPUI alleges that Peirick was an unsafe driver during the road trips. Def. Br. at 7. This allegation is disputed by players and parents. Bednar Aff. ¶ 12; H. Byard Aff. ¶ 12; Cunningham Aff. ¶ 12. Again, Peirick was not given the opportunity to respond to this accusation before her dismissal. *See* Pl. Ex. Z. In addition, one's driving record was not relevant to IUPUI's decision to hire Ms. Lord, who was never asked about her driving history during her interview but has fallen asleep at the wheel in the past. Andrea Lord Dep. at 162-64.

Fourth, IUPUI was upset at how Peirick allegedly handled a situation involving use of the Indianapolis Tennis Center ("ITC"), which is under the control of the University but not necessarily the Athletic Department. *See* Def. Br. at 8. After winning the regular season conference title, Peirick's team was entitled to host the conference tournament. Pl. Br. at 6. However, use of the ITC during the relevant time frame had already been reserved for other purposes, and Moore and O'Grady insisted that an alternative venue would have to be found. *Id.* at 6-7. Peirick believes that Moore and O'Grady did not make a genuine effort at trying to secure the ITC. *See* Peirick Dep. at 20-21. Peirick informed her players of the situation, and they were visibly upset. Pl. Br. at 7. While Peirick admitted expressing frustration with the administration to her players, she informed them that there was nothing she could do and that they were "just going to have to go talk to Mike about it, because this is all I can do." Peirick Dep. at 31-32. When the players approached O'Grady about

10

the ITC's availability, several of the players were taken aback by her lack of professionalism.  *See* Bednar Aff. ¶ 13; H. Byard Aff. ¶ 14; Cunningham Dep. at 23-25.  IUPUI contends that Peirick pitted the students against the administration, although this contention is challenged by Peirick's players.  *See* Cunningham Dep. at 25.  Moore now contends that Peirick's "act of disloyalty"[3] over this situation was the principal factor in his decision to not renew Peirick's appointment.  Moore Dep. at 131.  Moore made this determination, again, without following IUPUI's progressive discipline policy.  *See* Pl. Ex. Z.

Fifth, O'Grady complained of Peirick's behavior at the NCAA Tournament in Los Angeles.  O'Grady believes that Peirick acted rude and unprofessionally, including boarding the airplane home before all of her players had boarded.  O'Grady Dep. at 122.  However, several players and parents refute this accusation, and charge O'Grady with the rude and unprofessional behavior on the trip.  *See* Bednar Aff. ¶ 15; H. Byard Aff. ¶ 15; R. Byard Aff. ¶ 13.  These accusations did not follow IUPUI's progressive discipline policy.  *See* Pl. Ex. Z.

Sixth, Moore received an e-mail from one of the player's parents making various accusations against Peirick.  O'Grady Aff., Ex. 2.  However, these accusations are refuted by other parents, and the credibility of the e-mail's author is also called into question by other parents.  *See* Cunningham Aff. ¶ 15.  Peirick was not informed of these allegations until she initiated this action.  *See* Pl. Ex. Z.

Seventh, two players complained about Peirick to the administration.  Def. Br. at 12.  Other team members, however, accused the complainants of being petty and lacking credibility.  *See*

_____

[3]The origin of this phrase in this matter is in dispute, as IUPUI believes this act was critical to the decision to fire Peirick, *see* Def. Br. at 19, but Peirick notes that it was not at all stressed in the EEOC investigation.  *See* Pl. Reply at 4-7, 10.

H.Byard Aff. ¶¶ 13, 16; Cunningham Dep. at 43-44.  Neither Moore nor O'Grady informed Peirick of these complaints, and Peirick was not given an opportunity to respond.  *See* Pl. Ex. Z.  It was not uncommon for players to complain to the administration about coaches, although all other coaches received progressive discipline for such complaints.  *See* Ron Hunter Dep. at 26; Pl. Ex. T.

## II.  SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a "disfavored procedural shortcut, but rather [is] an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi*. *Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

On certain occasions, the Seventh Circuit has suggested that a court approach a motion for summary judgment in an employment discrimination case with a particular degree of caution. *See*, *e.g.*, *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir. 1989). The language implied that summary judgment might be less appropriate in this context based upon the presence of issues of motive and intent. *See*

*Holland*, 883 F.2d at 1312.   As the Seventh Circuit emphasized, however, these cases do not establish a heightened summary judgment standard for employment-related cases.   Instead, the language from the prior cases simply means "that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be."   *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997).   Even when discriminatory intent is at issue, summary judgment is appropriate when the nonmovant presents no evidence to indicate motive or intent in support of her position.   *See Holland*, 883 F.2d at 1312.   Further, the nonmovant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support.   *See Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994).

## III. <u>DISCUSSION</u>

While the methods of analysis of claims brought under Title VII and the ADEA are similar, Peirick's Title VII claim is discussed first as Peirick need only show a genuine question of material fact for that claim to survive summary judgment.   For Peirick's ADEA claims, however, actual success on the merits must be shown to obtain a permanent injunction.   Such a showing might even be unnecessary, as the ADEA raises particular jurisdictional concerns under the Eleventh Amendment of the U.S. Constitution.   *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000).   As such, the jurisdictional issues will be addressed before a determination on the merits of the ADEA is considered.   *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

## A.  PEIRICK'S TITLE VII CLAIMS

### 1.  The *Prima Facie* Case

Peirick has no direct evidence of discrimination.  Hence, for the purposes of proving a *prima facie* case, the framework under Title VII for an indirect method of proof has been stated by the Seventh Circuit as: "To make the *prima facie* case, the plaintiff must establish that: (1) she belongs to a protected class; (2) her performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated others not in her protected class received more favorable treatment."  *Moser v. Ind. Dept. of Corrections*, 406 F.3d 895, 900 (7th Cir. 2005).  It is not disputed that Peirick has met her burdens for the first and third factors of the indirect method of proof.  Def. Br. at 17; Pl. Br. at 24.

### a.  Whether Peirick Was Meeting IUPUI's Legitimate Performance Expectations

IUPUI identifies two reasons as to how Peirick did not meet its legitimate performance expectations: Peirick's poor use of language and the incidents surrounding the ITC.  Def. Br. at 18-20.  To meet her burden at this step, Peirick must establish that there is a genuine question of material fact as to whether she met IUPUI's legitimate performance expectations.  *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 887 (7th Cir. 2001).  The record must be viewed in light most favorable to Peirick.  *See id.*

IUPUI's Intercollegiate Athletics Coaches [sic] Performance Expectations specifies IUPUI's performance expectations:

1. ACADEMICS

    A.  Team GPA of 2.6 or higher.
    B.  Ensure team's compliance with IUPUI and Athletics Department

academic standards.
  C.  80% graduation rate (6 YR.) for all recruited scholarship student-athletes.

2.  COMMUNITY SERVICE INITIATIVES

  A.  Participate in designated campus and athletics department community outreach initiatives.
  B.  Work in conjunction with SWA on one team community service initiative.

3.  COMPLIANCE

  A.  Follow institutional, conference and NCAA rules and guidelines
  B.  Operate with no major violations or repeated secondary violations
  C.  Report secondary violations as they occur
  D.  Participate in all rules education meetings
  E.  Pass annual NCAA Recruiting Certification Test

4.  BUDGET MANAGEMENT

  A.  Develop components of budget consistent with established guidelines
  B.  Do not exceed FY operating budget
  C.  Follow IUPUI and athletics departmental guidelines for all fiscal matters

5.  FUNDRAISING

  A.  Participate in identifying potential donors to the Jaguars Athletics Club
  B.  Raise funds in conjunction with Athletics Director necessary for team to meet FY budget demands beyond the University allocation

6.  PROFESSIONAL CONDUCT AND DEVELOPMENT

  A.  Abide by all IU, IUPUI and athletics department rules regarding personal conduct
  B.  Participate in campus professional development opportunities
  C.  Attend all departmental monthly staff meetings

7.  ATHLETICS COMPETITION

  A.  Meet or exceed annual projected outcomes of athletics competition based on strength of schedule and Conference.  These outcomes will be established in annual pre-season meeting with the Director of Athletics.

Pl. Ex. B.

Comparing this Exhibit with Peirick's other evidence, this Court finds that the following are shown or are reasonably inferred: first, Peirick was meeting IUPUI's legitimate performance expectations with respect to academics. *See* Pl. Exs. K-Q. Second, Peirick was meeting IUPUI's legitimate performance expectations with respect to community service. *See* Pl. Exs. C-J. Third, Peirick was meeting IUPUI's legitimate performance expectations with respect to compliance with NCAA rules. *See* Pl. Br. at 17 (noting that Moore was unable to present Peirick with documentation of inappropriate behavior at the time of her release). Fourth, Peirick was meeting IUPUI's legitimate performance expectations with respect to budget management. *Cf.* Bednar Aff. ¶ 6; H. Byard Aff. ¶ 8; Cunningham Aff. ¶ 8 (testifying as to Peirick's management and planning). Fifth, Peirick was meeting IUPUI's legitimate performance expectations with respect to fundraising. *See* Peirick Dep. at 96 (alleged element of discrimination occurred at a fundraiser). Sixth, Peirick and several of her players, their parents, and her colleagues believed she was complying with and abiding by institutional rules, especially as those rules related to personal conduct. *See* Bednar Aff. ¶¶ 5-10; H. Byard Aff. ¶¶ 7-10, 17; Cunningham Dep. at 43-45; R. Byard Aff. ¶¶ 7-12; Cunningham Aff. ¶¶ 7-13, 15; Clark Dep. at 46; Franklin Dep. at 64-65; Rich Lord Dep. at 98-99; Simpson Dep. at 33. Seventh, Peirick was meeting IUPUI's legitimate performance expectations with respect to athletics competition. *See* Pl. Exs. R-S.

This Court finds genuine questions of material fact surrounding IUPUI's assertions that Peirick was not meeting its legitimate performance expectations. As to whether Peirick's use of foul language was a violation of IUPUI's legitimate performance expectations, it is undisputed by IUPUI that such language was common in the Athletics Department, including the Athletics Director himself. Yet, no other such punishment was dealt for its occurrence. *Compare* Def. Br. at 18-19

17

*with* Carroll Aff. ¶ 11, Clark Dep. at 38, Peirick Dep. at 274-75, *and* Simpson Dep. at 64.

As for Peirick's alleged "act of disloyalty," whether this was a violation of IUPUI's legitimate performance expectations is also called into doubt by the facts proffered.  IUPUI made no attempt to investigate[4] the legitimacy of this apparently egregious issue after it was allegedly raised by the student-athletes.  *See* Pl. Br. at 10-11.  Also, although Peirick admitted expressing frustration with the administration to her players over the ITC, Peirick Dep. at 20-21, 31-32, 35, 39, Peirick offers evidence supporting her assertion that she never "pitted" the students against the administration, as IUPUI contends.  Def. Reply at 1.  *See* Cunningham Dep. at 25, 31-32 ("[The students who went to talk to O'Grady about the ITC d]idn't know if [the administration] could [do anything], but we wanted to find out.  So that's why we went to talk to Denise.").  IUPUI's only evidence that there was such an act of disloyalty is O'Grady's assessment of what happened in her office.  *See* Def. Br. at 19-20; Def. Reply at 3-5.  However, O'Grady's recitation is called into doubt by several of the students who were present and believed that O'Grady was acting unprofessionally.  *See* Bednar Aff. ¶ 13; H. Byard Aff. ¶ 14; Cunningham Dep. at 23-25.  Hence, Peirick has established a genuine question of material fact as to both whether such an act of disloyalty occurred and, if it did, whether it was a violation of IUPUI's legitimate performance expectations.

IUPUI also seems to justify its reasoning surrounding the ITC incidents as the culmination of the series of elements throughout her final year.  *See* Def. Br. at 20-21.  While this position is more consistent with the EEOC investigation that was conducted much closer to Peirick's dismissal,

---

[4]As discussed further below, presumably this is because IUPUI believed Peirick to be only an hourly employee and therefore she was not subject to IUPUI's progressive discipline policy.  However, IUPUI fails to address why such an investigation was not conducted under the IUPUI Code of Conduct 5.1.4 ("The participant shall be given the opportunity to receive and provide information regarding the alleged noncompliance.") and other applicable provisions.  Pl. Ex. U.

*see* Pl. Ex. AA, the legitimacy of each of these additional elements—at least in regards to IUPUI's construction of them—is called into doubt by the facts proffered by Peirick. *See* Bednar Aff. ¶¶ 11-13, 15; H. Byard Aff. ¶¶ 11-16; R. Byard Aff. ¶¶ 9, 13; Clark Aff. ¶ 11; Cunningham Aff. ¶¶ 10-12, 15; Clark Dep. at 38; Cunningham Dep. at 20, 23-25; Ron Hunter Dep. at 26; Andrea Lord Dep. at 162-64; Peirick Dep. at 20-21, 31-32, 274-75; Simpson Dep. at 64. IUPUI never fully investigated any of these alleged claims when they arose, and so it is unable to present any objective evidence surrounding the ITC incidents.

The only objective piece of evidence IUPUI presents to support its position that Peirick was not meeting her performance expectations is Peirick's annual review following the 1999 season.[5] On this review, Peirick received six out of a possible thirty-one scores below a level defined as "[w]ork is professional and satisfactory." Peirick Dep. Ex. 11. This review also contained the following comments:

> (1) Coach Peirick is to be commended for her community service activities and academic team success. Good job!
> (2) The student-athletes are sending a message to change personal behavior which should be heeded as constructive critique. Improvement is expected in this area for 1999-2000[.]
> (3) Fourth Place Conference finish should be recognized as a great accomplishment in IUPUI's 1st year of Mid-Continent Conference competition. As of April 21st, this is the 1st IUPUI team to place 4th in a sport which has a qualifying standard for Conference play. Good job!

*Id.* IUPUI did not submit the annual review for 2000 or other subsequent years, yet seems to be relying on the "constructive critique" listed as comment 2 as its basis for dismissal. However, to the extent that IUPUI's evidence is offered to show a history of poor player treatment, this construction

---

[5]IUPUI also cites O'Grady's contemporaneous notes during Peirick's final season. Def. Reply at 14. However, as has been noted, O'Grady's credibility has been called into doubt by Peirick.

is not necessarily supported by subsequent evidence.  *See* Bednar Aff. ¶¶ 11-13, 15; H. Byard Aff. ¶¶ 11-16; R. Byard Aff. ¶¶ 9, 13; Clark Aff. ¶ 11; Cunningham Aff. ¶¶ 10-12, 15; Clark Dep. at 38; Cunningham Dep. at 20, 23-25; Ron Hunter Dep. at 26; Andrea Lord Dep. at 162-64; Peirick Dep. at 20-21, 31-32, 274-75; Simpson Dep. at 64.  Also, neither the 1999 nor 2000 report seemed to play a role in IUPUI's employment decision at the relevant time frame of Peirick's dismissal.  *See* Pl. Ex. AA; *Moser*, 406 F.3d at 901.

This Court finds that Peirick has presented sufficient evidence to establish a genuine question of material fact as to whether she was meeting IUPUI's legitimate performance expectations.

**b.  Whether IUPUI Treated Similarly Situated Male Employees More Favorably**

IUPUI argues that none of the male head coaches are comparable to Peirick because they did not engage in comparable conduct, namely Peirick's single "act of disloyalty" or the totality of events in her final year.  Def. Br. at 20-21.  The Seventh Circuit recently stated the standard for determining whether two employees are similar situated in disciplinary cases:

> In determining whether employees are similarly situated, we must look at all relevant factors, the number of which depends on the context of the case.  In disciplinary cases, those cases in which the plaintiff claims he or she was disciplined more harshly than another employee based on a prohibited reason, the plaintiff must show that he or she is similarly situated with respect to performance, qualifications and conduct.  This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

*Ezell v. Potter*, 400 F.3d 1041, 1049-50 (7th Cir. 2005) (internal quotations and citations omitted). The *Ezell* Court also noted that "the law is not [so] narrow [as to require exactly the same infraction]; the other employee must have engaged in similar—not identical—conduct."  *Id.* at 1050.  It is not

disputed that all of the head coaches were subordinate to Moore, the Athletics Director.  They were also all subject to the same standards[6] and expectations.  Pl. Exs. B, T, U.  As such, it must be resolved whether Peirick and the other head coaches engaged in similar conduct.

While this Court gives deference to IUPUI on the weight of seriousness to be assigned to particular employee behaviors, *see Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986), the conduct in question need not find an identical counterpart in those Peirick puts forth as her comparables.  *See Ezell*, 400 F.3d at 1050.  With this in mind, IUPUI clearly asserts that Peirick's "act of disloyalty" (or, alternatively, the totality of events in her final season) was a fireable offense, although the facts demonstrate that Peirick's conduct was not of such severity to warrant immediate termination since IUPUI waited two months after the ITC incident to discontinue Peirick's employment.  Pl. Reply at 6.  Hence, similar conduct would be any conduct serious enough to warrant a consideration of termination.  *Cf. Ezell*, 400 F.3d at 1050 (finding that a white plaintiff fired from the Post Office for allegedly taking a long lunch satisfied the burden of summary judgment on this element of the *prima facie* case by showing that a black employee who had lost certified mail went unpunished).  As such, if any of Peirick's three cited comparables—Lord, Franklin, or Andrews—has had similar conduct, Peirick will have demonstrated that at least one other male head coach was similarly situated.

Peirick successfully demonstrates that at least one other male coach was similarly situated to her in regards to her alleged conduct.  After receiving fourteen of a possible thirty-one scores at or below a level defined as "[e]ffort must be made to reach acceptable level" in his 1999 annual review, Lord received the following comment: "Your future IUPUI employment as men's tennis

---

[6] Whether they were all subject to the progressive discipline policy is developed below, but it is at least clear that they were all subject to IUPUI's Code of Conduct.

coach depends on improvement in the areas discussed in this document." Pl. Ex. KK.  As such, Lord had engaged in conduct serious enough to warrant a consideration of termination by IUPUI.  In addition, Franklin, after receiving multiple complaints in regards to personal conduct, received a letter from Moore in November 2003, setting forth stipulations that Franklin was required to follow in order for him to "continue as the head coach . . . Failure to meet these expectations [would] result in immediate termination."  Pl. Ex. SS.  Hence, Franklin also engaged in conduct serious enough to warrant a consideration of termination by IUPUI.  However, Peirick is unable to identify evidence demonstrating that Andrews engaged in conduct serious enough to warrant a consideration of termination by IUPUI.  *See* Pl. Br. at 20.  As such, at least Lord and Franklin are comparable to Peirick.

Having shown the existence of a similarly situated male employee, Peirick's primary evidence that the similarly situated male employees were treated more favorably is that the male head coaches were given an opportunity to respond to the allegations against them before an employment decision was made.  This policy arises primarily under IUPUI's progressive discipline policy,[7] which states that "an opportunity to receive and present information and ask questions . . . *before* making a decision to discipline" shall be provided.  Pl. Ex. T (original emphasis).  IUPUI does not dispute that the male coaches during Peirick's employment received progressive discipline, but instead argues that Peirick was not entitled to the progressive discipline policy according to human resources personnel Jones.  However, IUPUI makes no attempt to reconcile Jones's statement that O'Grady, another employee within the Athletics Department, is the one who told Jones that Peirick was an

---

[7]Even if the progressive discipline policy did not apply, Peirick points out—and IUPUI does not dispute—that IUPUI was nonetheless under a burden to give Peirick an opportunity to respond to the allegations against her, an opportunity all of Peirick's male colleagues received, as per IUPUI Code of Conduct 5.1.4.  Pl. Ex. U.

hourly employee.  *Compare* Def. Reply at 6-7 *with* LaVonne Jones Dep. at 83.  In other words, IUPUI's only evidence that Peirick was an hourly employee is its own employee's statement, whose credibility on the issue is questionable.

The plain language of the progressive discipline policy states that it applied to appointed and monthly staff, and Peirick's appointment cover letter plainly states that she was appointed and paid monthly.  *Compare* Pl. Ex. T *with* Pl. Ex. CC.  In addition, the same appointment cover letter was used for Andrews, and it is undisputed that he properly received progressive discipline.  Pl. Ex. CCC.  IUPUI attempts to distinguish the head coaches on a "part-time" and "full-time" basis, with part-time coaches not being entitled to progressive discipline and full-time coaches being so entitled.  Under this arrangement, Peirick is classified as a part-time coach and seems to have been the only such head coach during her employ at IUPUI.  Notably, however, IUPUI is unable to point to any evidence to demonstrate that one can be appointed and paid monthly and still be an hourly employee.  *See* Def. Br. at 20-21.  Further, such a distinction seems to directly contradict the similarity in appointment cover letters received by Andrews and Peirick.  *Compare* Pl. Ex. CCC *with* Pl. Ex. CC.  Peirick was paid in monthly installments, and she was appointed.  Pl. Ex. CC.  This Court therefore finds that Peirick was entitled to progressive discipline.  As such, Peirick has established a genuine question of material fact as to whether similarly situated male employees were treated more favorably.  *See Ezell*, 400 F.3d at 1050; *Gordon*, 246 F.3d at 888.

## 2. Whether IUPUI's Justifications Were Pretextual

Once the *prima facie* case has been established, the burden of proof shifts to the employer to articulate that the basis of its employment decision did not rest on an illegitimate ground.  *See*

*Moser*, 406 F.3d at 900-01.  Once IUPUI has done so, Peirick must show by a preponderance of the evidence that IUPUI's reasons were merely a pretext for discrimination.  *Id.*  Thus, the issue subsequent to the *prima facie* case is "whether the employer honestly based its employment decision on performance-related considerations." *Dey v. Colt. Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994).  To show that IUPUI did not honestly believe its decision to terminate her employment was performance based, Peirick must offer evidence "either that a discriminatory reason more likely motivated the employer *or* that the employer's proffered explanation is unworthy of credence." *Robinson v. PPG Inds., Inc.*, 23 F.3d 1159, 1163 (7th Cir. 1994) (emphasis original) (quoting *La Montagne v. Am. Convenience Prod., Inc.*, 750 F.2d 1405, 1409 (7th Cir. 1984)). As has been noted by the Seventh Circuit, the "issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext." *Gordon*, 246 F.3d at 886.  To satisfy her burden on summary judgment, Peirick must present "evidence from which a finder of fact could reasonably infer pretext." *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1309 (7th Cir. 1997).

As has been explained, IUPUI defends its decision to not renew Peirick's appointment by asserting that Peirick was not meeting its performance expectations, primarily in regards to her use of language and the incidents surrounding the ITC.  In response, Peirick successfully demonstrates "either that a discriminatory reason more likely motivated the employer *or* that the employer's proffered explanation is unworthy of credence." *Robinson*, 23 F.3d at 1163 (emphasis original).

Peirick offers sufficient evidence to create a reasonable inference that a discriminatory reason may have been IUPUI's motivation for its employment decision.  In Moore's five-year administrative review, it was noted that there existed at IUPUI "a perceived differential treatment of male and

24

female coaches . . . both males [sic] and female staff raised this issue.  Some staff feel that Mr. Moore appears to be uncomfortable dealing with women or may not value women [sic] sports as much as men's sports."  Pl. Ex. EE at 3.  The conclusions of this review are supported by other women employees in IUPUI's Athletics Department who perceived an atmosphere of gender discrimination.  *See* Carroll Aff. ¶¶ 6-7, 15; Simpson Dep. at 43-48, 53.  This evidence, along with the reasons noted in the *prima facie* discussion, also allows Peirick to demonstrate that IUPUI's proffered reasons for her dismissal—her alleged use of abusive language and the incidents surrounding the ITC—are pretext.  IUPUI's additional defenses that Peirick was replaced by a female and that one of Peirick's supervisors, O'Grady, was a female are likewise unconvincing for purposes of summary judgment.  "Laws against discrimination protect persons, not classes."  *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir. 1996).

For the foregoing reasons, IUPUI's Motion for Summary Judgment on the Title VII issues is **DENIED**.

## B.  PEIRICK'S ADEA CLAIMS

### 1.  IUPUI's Eleventh Amendment Immunity

It is clear that IUPUI "enjoys the same Eleventh Amendment immunity as the State of Indiana itself."  *Woods v. Indiana Univ.–Purdue Univ. at Indianapolis*, 996 F.2d 880, 883 (7th Cir. 1993).  It is also clear that "the ADEA does not validly abrogate the States' sovereign immunity."  *Kimel*, 528 U.S. at 91.  As such, no claim for monetary damages can be maintained against IUPUI under the ADEA.  *See id.*  What is not so clear, however, is whether Peirick's claim for permanent

injunctive relief[8] under the ADEA can be maintained against IUPUI.

The Eleventh Amendment's protection of state sovereign immunity is a fundamental aspect of our federalism.  As the Supreme Court has said:

> While state sovereign immunity serves the important function of shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens, the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns.  It is for this reason, for instance, that sovereign immunity applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief.
>
> Sovereign immunity does not merely constitute a defense to monetary liability or even to all types of liability.  Rather, it provides an immunity from suit.

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765-66 (2002) (internal quotes and citations omitted).

However, while the Eleventh Amendment serves to prohibit federal adjudications that "would be an affront to States' sovereignty," *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 452 (2004), the Eleventh Amendment does not provide an absolute bar from suit in the federal forum.  *See Alden v. Maine*, 527 U.S. 706, 755 (1999).  For example, in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), the Court held that Eleventh Amendment immunity bars a claim for monetary damages under the Americans with Disabilities Act ("ADA").  531 U.S. at 374.  Yet, the Court expressly limited its holding to claims for monetary relief, noting that private individuals may sue officers of the state for injunctive relief to enforce the standards of the ADA under *Ex parte Young*, 209 U.S. 123 (1908).  *Garrett*, 531 U.S. at 374 n.9.

---

[8]Peirick's claims for permanent injunctive relief include restoring her to her position as head coach of the women's tennis team at IUPUI with full compensation for lost pay (or front pay in lieu of reinstatement), IUPUI issuing a letter of apology, IUPUI writing her a favorable letter of reference, and IUPUI holding a seminar on age and sex discrimination for its employees.  Compl. at 9-11.

Similarly, in *Kimel*, the Court narrowly held that Eleventh Amendment immunity bars suits for monetary relief against a state under the ADEA.  *Kimel*, 528 U.S. at 91.  However, the Court did not make an express reservation as to alternative forms of relief that could be claimed against a State under the ADEA.  Despite this, the First and Sixth Circuits have both held that the reasoning of *Garrett* is equally applicable to the ADEA and therefore injunctive relief under the ADEA is permissible against states when combined with *Ex parte Young*.  *See State Police for Automatic Ret. Ass'n v. DiFava*, 317 F.3d 6, 12 (1st Cir. 2003); *Meekison v. Voinovich*, No. 98-4107, 2003 WL 21418243, at *1 (6th Cir. June 18, 2003).  The Seventh Circuit has not spoken directly to the issue of the availability of injunctive relief against a State under the ADEA.  However, the Seventh Circuit has recognized the availability of injunctive relief against state officials in their official capacity under *Ex parte Young*.  *See Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987).

This Court is persuaded by the reasoning of authority in allowing injunctive relief under the ADEA and *Ex parte Young*.  The ADEA itself allows this Court "to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment [or] reinstatement."  29 U.S.C. § 626(b).  As such, Peirick's claims against the Indiana University-Purdue University Athletics Department and the Board of Trustees of Indiana University must be accepted as within this Court's subject-matter jurisdiction, as they "have some connection with the enforcement of the act." *Ex parte Young*, 209 U.S. at 157.  However, Peirick's claims against the State itself, as represented by Indiana University-Purdue University Indianapolis, do not fall within the scope of *Ex parte Young* and are therefore outside this Court's jurisdiction.

27

**2.  Peirick's Request for a Permanent Injunction**

There are several factors to a claim for injunctive relief for the Court to consider.  Peirick must demonstrate: (1) actual success on the merits; (2) that she does not have an adequate remedy at law or that she will suffer irreparable harm without an injunction; (3) that the balance of harms between Peirick and IUPUI favors entering the injunction, and (4) entry of the injunction will not harm the public interest.  *See Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003).

Peirick's evidence that she was discriminated against on the basis of age is that she was the oldest of the coaches at IUPUI and she did not receive progressive discipline, and that her replacement was thirty years her junior and paid more despite less experience.  *See* Pl. Br. at 21-22, 34-35.  However, assuming a *prima facie* case, the Court is not convinced that Peirick has presented sufficient evidence that *her age* was the primary reason for her dismissal.  *See Miller v. Borden, Inc.*, 168 F.3d 308, 313.  The fact that she was replaced by a younger employee, and that IUPUI decided to give that employee a different salary, is, in itself, insufficient to raise an inference of age-based discrimination.  *See Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 430 (7th Cir. 1989) (quoting *La Montagne*, 750 F.2d at 1413); *Dale*, 797 F.2d at 464.  Therefore, this Court is not convinced that Peirick actually succeeds on the merits of her ADEA claim.

For the foregoing reasons, this Court **GRANTS** IUPUI's Motion for Summary Judgment on Peirick's ADEA claims.

## IV.  **CONCLUSION**

For the reasons stated herein, this Court **GRANTS** in part and **DENIES** in part IUPUI's

Motion for Summary Judgment.

IT IS SO ORDERED this 27th day of June, 2005.

_____
LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Kevin W. Betz                           Ellen E. Boshkoff
BETZ & ASSOCIATES                       BAKER & DANIELS
kbetz@kbetzlaw.com                      eeboshko@bakerd.com

Carolyn A. Clay                         Edward E. Hollis
BETZ & ASSOCIATES                       BAKER & DANIELS
cclay@betzadvocates.com                 eehollis@bakerd.com

                                        Kellye M. Gordon
                                        BAKER & DANIELS
                                        kellye.gordon@bakerd.com